STATE of Alaska, Appellant,

v.

Brent FORTUNY, Appellee.

Brent Fortuny, Cross–Appellant,

v.

State of Alaska, Cross–Appellee.

Nos. A–7801, A–7811.

Court of Appeals of Alaska.

March 8, 2002.

---

Kim S. Stone, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for the State of Alaska.

Darryl L. Thompson, Anchorage, for Brent Fortuny.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

### OPINION

MANNHEIMER, Judge.

Brent Fortuny drove while he was intoxicated and injured someone else. He ultimately pleaded no contest to third-degree assault (a class C felony) and misdemeanor driving while intoxicated.[1] While awaiting sentencing, Fortuny spent four months at Genesis House, a residential alcoholism treatment facility. The question is whether Fortuny should receive credit against his sentence for some or all of the time he resided at Genesis House.

For the past thirty-five years, Alaska law has granted defendants credit against their sentence "for time spent in custody pending trial, sentencing, or appeal, if the detention was in connection with the offense for which sentence was imposed".[2] Almost twenty years ago, in *Nygren v. State,* 658 P.2d 141 (Alaska App.1983), this court expanded a defendant's right to receive "credit for time served" when we held that defendants should receive credit against their sentence for time spent in a treatment facility as a condition of release if the restrictions imposed by that facility "approximat[e] those experienced by one who is incarcerated".[3]

*Nygren* contains the following description of the types of restrictions that will normally be deemed equivalent to incarceration:

> [R]esidents are invariably there by court order; the facilities require residency, and residency requirements are sufficiently stringent to involve a definite element of confinement; residents of the facilities are subject to twenty-four hour physical custody or supervision; any periods during which residents may be permitted to leave the facility are expressly limited, both as to time and purpose; while in the facility, residents are under a continuing duty to conform their conduct to institutional rules and to obey orders of persons who have immediate custody over them; and residents are subject to sanctions if they violate institutional rules or orders and to arrest if they leave the facility without permission.

*Id.* at 146.

Genesis House is a residential treatment facility for alcohol and substance abuse. The facility is supervised twenty-four hours a day by its staff. Residents must not leave the

---

1. AS 11.41.220(a)(1)(B) and AS 28.35.030(a)(1), respectively.

2. AS 12.55.025(c), enacted by SLA 1978, ch. 166, § 12. Before 1978, the same provision was contained in former AS 11.05.040(a).

3. *Id.* at 146 (citing *Paul v. State,* 560 P.2d 754, 758 (Alaska 1977)).

facility without permission, they must abide by a set of house rules, and they must obey a curfew at night. Residents are subjected to hourly bed checks after curfew, as well as random checks during the day. Residents are also subjected to random urine and breath tests to make sure that they are not consuming alcohol or controlled substances.

At first blush, Genesis House would seem to fit the *Nygren* criteria, and Fortuny would seemingly be entitled to credit against his sentence for the four months he spent there (February 20, 2000 through June 20, 2000). But there are two wrinkles in the situation.

First, Fortuny did not enter Genesis House pursuant to a court order; instead, he voluntarily entered the treatment program. This situation changed on April 4, 2000, when the court ordered Fortuny to continue the program at Genesis House as a condition of release. But the State argues that Fortuny is not entitled to *Nygren* credit for the 43 days from February 20th through April 3rd (the last day of Fortuny's voluntary residence at Genesis House).[4]

Second, Fortuny did not spend twenty-four hours a day at Genesis House. Rather, he was granted work release.

At the discretion of the Genesis House staff, some of its residents are allowed to leave the facility to attend work. Patients who are granted work release must fill out a weekly work verification form. In this form, the patient outlines the dates and hours they will be gone, and the patient supplies the names, positions, and telephone numbers of the people who can verify their work attendance. The Genesis House staff randomly contacts the workplace to ascertain that the patient is indeed on the job.

Between February 20th and May 27th, Fortuny was absent from Genesis House as much as six days a week, and sometimes for as long as ten or eleven hours at a stretch. On May 28th—the last day of Fortuny's work release—he misused his release privilege and stayed away from Genesis House for 18 hours. This caused the Genesis House staff to revoke Fortuny's work release privileges, although they did not terminate him from the program because they believed that he was making progress. (Fortuny remained a twenty-four-hour-a-day resident of Genesis House from May 29th through June 20th, when he completed the residential program and was discharged.)

Because Fortuny spent so many hours away from the facility on work release between February 20th and May 28th, Superior Court Judge Larry D. Card concluded that Fortuny should not be given whole-day *Nygren* credit for those days. Instead, Judge Card excluded Fortuny's work-release hours and gave him credit only for the remaining hours. This decision prompted both parties to appeal. The State argues that Fortuny should get no credit at all for these days. The State contends that, because of Fortuny's work release status, he was able to pursue his normal livelihood and to use Genesis House merely as a dormitory. Fortuny, on the other hand, argues that he should get whole-day credit for these days of employment because work release is a staff-sanctioned aspect of the Genesis House program.

*The 43 days from February 20th through April 3rd*

██ Fortuny voluntarily entered the Genesis House residential program on February 20, 2000. He remained there voluntarily until April 4th, when (at Fortuny's request) the court altered the conditions of his release to require his residence at Genesis House. Thus, beginning on April 4th, Fortuny resided at Genesis House under court order. The question is whether Fortuny is entitled to *Nygren* credit for the 43 days he spent at Genesis House before April 4th.

Judge Card gave Fortuny partial *Nygren* credit for these 43 days (subtracting the hours that Fortuny spent on work release). We conclude that it was plain error for Judge Card to award any *Nygren* credit for these 43 days.

One of the chief criteria established by *Nygren* for identifying a "custody-like" residential placement is that "residents are in-

4. The year 2000 was a leap year.

variably sent there by court order".[5] We underscored this requirement in *Municipality of Anchorage v. Bussell*, 702 P.2d 667 (Alaska App.1985).

In *Bussell*, the defendant voluntarily entered a residential treatment program after receiving assurances from the trial court that he would be given credit against his sentence for the time he spent there. However, the court never ordered Bussell to participate in this residential treatment. We granted a petition to review this situation because we concluded that *Nygren* credit could be awarded only for court-ordered placements, and we wished to forestall the possibility that Bussell would rely to his detriment on the trial court's assurances:

> *Nygren* allow[s] a person credit for time served in a therapeutic community ..., but only [when] the individual is confined in the therapeutic program by virtue of a court order validly issued requiring that he or she remain there.... There is nothing in this record indicating that [the trial court] ever purported to enter an order requiring Bussell to be lodged at the Far North Recovery Center, either as a condition of pretrial release or as a condition of post-conviction probation. Therefore, on this record, [the trial court had] no basis for predicting that any time Bussell spent at the Far North Recovery Center could be credited against [his] sentence....

*Id.*, 702 P.2d at 668–69.[6]

Based on *Nygren* and *Bussell*, we agree with the State that it was plain error for Judge Card to award Fortuny any *Nygren* credit for his initial 43 days at Genesis House.

*The 55 days from April 4th through May 28th*

■ Beginning on April 4, 2000, Fortuny resided at Genesis House under a court order requiring him to do so. However, as described above, the Genesis House staff gave Fortuny work release privileges. Pur-

suant to his work release, Fortuny was away from the facility for up to ten or eleven hours a day, for five or six days a week. This situation continued until May 28th, when Fortuny abused his work release privilege and the Genesis House staff revoked his work release status. Beginning on May 29th, Fortuny was confined to Genesis House twenty-four hours a day until his discharge from the residential program on June 20th.

Judge Card gave Fortuny partial *Nygren* credit for the 55 days from April 4th through May 28th. (Again, the judge subtracted the hours that Fortuny spent on work release.) Both the State and Fortuny appeal this ruling. The State argues that Fortuny should receive no credit for these days, while Fortuny argues that he should receive full credit for these days.

The State's argument that Fortuny should receive no credit is simply an extension of Judge Card's thesis that Fortuny should not receive credit for the hours he spent away from Genesis House at his job. The State agrees that Fortuny should not receive credit for the time he spent at work, but the State takes the argument one step further. According to the State, Fortuny's job-related absences were so extensive that he basically was able to lead his normal life, with the exception that he had to return to Genesis House to sleep. Under these circumstances, the State argues, Fortuny was not subjected to the kinds of restrictions that characterize incarceration and so he should not receive *Nygren* credit at all.

But the record does not support the State's view of the situation. As explained above, work release status must be granted by the Genesis House staff. When it is granted, the patient must fill out a weekly work verification form, describing the dates and hours they will be gone and supplying the names, positions, and telephone numbers of the people who can verify their work attendance. In addition, the Genesis House staff randomly contacts the patient's workplace to ascertain that the patient is indeed

---

**5.** *Id.*, 658 P.2d at 146.

**6.** *See also State v. Monk*, 886 P.2d 1315, 1318 n. 7 (Alaska App.1994) (holding that a defendant was not entitled to *Nygren* credit when his resi-

dence at a treatment facility was required by his employer, the United States Coast Guard, but not by the court).

on the job. Moreover, even when work release is granted, the patient must continue to abide by the other rules and restrictions of the Genesis House program—*e.g.*, breath and urine testing, curfew, and bed checks.

The record shows that the Genesis House staff did indeed monitor Fortuny's absences—and that they quickly terminated Fortuny's work release status when he abused his work privileges by remaining away from the facility for eighteen hours on May 28, 2000.

We further note Fortuny's work release privileges at Genesis House are not conspicuously different from the work release privileges that are granted to selected prisoners in the custody of the Department of Corrections. AS 33.32.015(b)(4) empowers the Commissioner of Corrections to "authorize a prisoner to engage in vocational training or in productive employment within or outside a correctional facility". As stated in AS 33.32.010(2), one of the legislature's purposes in granting the commissioner this authority was to

> provide realistic work experience and vocational training for prisoners under conditions as much like those that prevail in private industry as possible, consistent with proper penal administration, and to direct [prisoners'] efforts toward financial responsibility, acquiring or improving effective work habits and occupational skills, and increasing the probability of opportunities for employment after [their] release[.]

Under 22 AAC 05.350(a), the Department of Corrections can assign a prisoner to be housed at a "restitution center" so that the prisoner can participate in "restitution, work, and community service programs". As stated in 22 AAC 05.350(b), these restitution centers are designed to offer an alternative to traditional incarceration, a program of "partial incarceration" that "provides the opportunity for prisoner rehabilitation through community service and employment while protecting the community". Prisoners placed at these restitution centers must "agree to remain at the center at all times except while at work or a community service project, while traveling to or from work or a community service project or an approved job interview, or during an approved emergency absence or furlough".[7]

In other words, Fortuny's status at Genesis House during the 55 days when he enjoyed work release privileges was not much different from the status of many prisoners serving sentences under the custody of the Department of Corrections. For these reasons, we reject the State's argument that Fortuny should not receive *Nygren* credit for these 55 days.

For these same reasons, we agree with Fortuny that he should receive full credit for these 55 days, not just the partial credit that Judge Card gave him. When Fortuny attended work, he was not playing hooky from Genesis House. Rather, the clinical staff at Genesis House views work release as part of the treatment regimen. Dr. Donolitea Maloney, the clinical director at Genesis House, testified that work release is a "vital link" in the treatment program, designed to supplement the structured living environment of Genesis House by "prepar[ing] an individual ... to continue [a life of] sobriety once they return to the real world". Dr. Maloney also noted that work release "allows [patients] to continue their responsibilities as an adult within our society", to support their dependents, and "to assume responsibility for [the costs of] their [treatment]."

These clinical aims mirror the legislature's announced aims when it authorized work release of sentenced prisoners: to "provide realistic work experience and vocational training for prisoners under conditions as much like those that prevail in private industry as possible, ... to direct [prisoners'] efforts toward financial responsibility, [and to enable prisoners to] acquir[e] or improv[e] effective work habits and occupational skills, [thus] increasing the probability of opportunities for employment after [their] release[.]"[8]

In other words, the legislature does not view work release as a vacation from correc-

---

7.  22 AAC 05.352(a)(4).

8.  AS 33.32.010(2).

tional supervision, but instead as a supplemental method of correction—a means of fostering rehabilitation and reducing recidivism. If Fortuny and similarly situated defendants were denied credit for the time they spent on work release, this would undercut the acknowledged rehabilitative benefits of work release—by deterring defendants from seeking work release and, potentially, deterring treatment programs from offering it.

For these reasons, we conclude that Fortuny should receive full credit for the days he resided at Genesis House under court order, even the days when he was authorized to spend many hours away from the treatment facility on work release.

*Conclusion: Our calculation of Fortuny's Nygren credit, and our reason for remanding his case to the superior court*

Fortuny resided at Genesis House from February 20, 2000 through June 20, 2000. However, no court order obliged him to reside there until April 4th. As we have explained in this opinion, we conclude that Fortuny is not entitled to *Nygren* credit for the first 43 days of his stay (February 20th through April 3rd), but we also conclude that Fortuny is entitled to full *Nygren* credit for the remainder of his stay (April 4th through June 20th)—a total of 78 days.

This total is 15 days less than the 93 days of *Nygren* credit that Judge Card calculated. This 15–day difference prompts us to remand Fortuny's case to the superior court so that Judge Card can have an opportunity to reconsider Fortuny's sentence.

Fortuny's composite sentence was 30 months with 25 months suspended—*i.e.*, 5 months to serve. But Judge Card believed that Fortuny had already served 93 days of this 150–day sentence. Because the length of Fortuny's sentence (150 days to serve) is not much greater than Fortuny's credit for time served (under Judge Card's calculation), it is possible that Judge Card imposed 5 months to serve in tacit reliance on the assumption that Fortuny had 93 days of *Nygren* credit, and that Fortuny would therefore spend less than 2 additional months in jail.

Fortuny does not have 93 days of *Nygren* credit; he has only 78 days. Because this difference of 15 days in the *Nygren* calculation might make a difference in Judge Card's sentencing decision, we REMAND this case to the superior court. If Judge Card was relying on the figure of 93 days when he sentenced Fortuny to serve 5 months in jail, the judge now has the discretion to reduce Fortuny's time to serve.

We do not retain jurisdiction of Fortuny's case.